UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X
                                                                                 :

**DANIEL FELICIANO**,

                     Plaintiff,

          – against –

**COMMISSIONER OF SOCIAL SECURITY**,

                   Defendant.

**MEMORANDUM DECISION AND ORDER**

21-CV-1800 (AMD)

---------------------------------------------------------------- X

**ANN M. DONNELLY**, United States District Judge:

       The plaintiff challenges the Social Security Commissioner's decision that he was not disabled for the purpose of receiving Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"). Before the Court are the party's cross-motions for judgment on the pleadings. (ECF Nos. 11, 13.) For the reasons set forth below, the plaintiff's motion for judgment on the pleadings is granted, the Commissioner's motion is denied, and the case is remanded for further proceedings consistent with this opinion.

## BACKGROUND

       The plaintiff was born in 1960 and attended school with special education services through the twelfth grade. (Tr. 31, 423, 486.) The plaintiff was diagnosed with a learning disability as a young child and cannot read or write. (*Id*.) He has worked as a messenger, mail clerk, and most recently as a janitor, until he stopped working to care for his mother in 2017. (Tr. 31, ECF No. 11-1 at 2.) When his mother passed away that same year he became depressed and never went back to work. (Tr. 39-40.) The plaintiff reports that his brother and sister-in-law help with many of the daily tasks of living. (*Id*.; Tr. 274-78.)

On March 14, 2018, the plaintiff protectively filed an application for DIB alleging disability as of July 1, 2017. (Tr. 57.) When his claim was denied, he requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 10.) ALJ Gina Pesaresi held a hearing on March 18, 2020 and denied the plaintiff's claim on June 1, 2020. (Tr. 132, 18.)

### a. Treating Physician Opinions

Dr. Lucy Kolloori saw the plaintiff monthly from December 2017 to June 2018. (Tr. 315-16, 414-17, 421-24, 466-67, 474-75, 507-08.) Dr. Kolloori diagnosed the plaintiff with adjustment disorder, anxiety, depression and a learning disability, and prescribed Remeron. The plaintiff told Dr. Kolloori that the Remeron made it easier to sleep. (Tr. 315, 416.) On February 27, 2018, Dr. Kolloori opined that the plaintiff was employable with limitations due to his learning disability. (Tr. 421-22.)

Dr. Ashraf Elshafei treated the plaintiff continually from September 27, 2018 to March 2, 2020 with psychotherapy and medication management for depressive and panic disorders. (Tr. 497, 566.) Dr. Elshafei reported consistently that the plaintiff was "polite" but agitated. (Tr. 566, 572, 576.) The plaintiff told the doctor that he had trouble sleeping and a decreased appetite, but that he could manage daily activities. (Tr. 562-84.) On March 12, 2020, Dr. Elshafei opined that the plaintiff had "no useful ability" to "relate to co-workers," "deal with work stresses," "function independently," or "understand, remember, and carry out complex job instructions." (Tr. 585-86.) He was "seriously limited" in his ability to "follow work rules," "deal with the public," "use judgment," "interact with supervisors," "maintain attention or concentration," and "understand, remember and carry out detailed or simple job instructions." (*Id*.) Dr. Elshafei's treatment consisted of "counsel[ing] the patient about dealing with his stress and strategies to minimize stress, to control anxiety feeling, and for anger management." (Tr.

2

575.) Dr. Elshafei added that the plaintiff's medication made it harder for him to concentrate, focus, and make decisions. (Tr. 586.)

    b. **Consultative Opinions**

The plaintiff received multiple assessments from physicians at FEGS WeCare, a social services program "designed to assist individuals to transition off cash assistance." (ECF No. 13-1 at 3.) On October 19, 2017, FEGS physician Dr. Roshan Kothandaram examined the plaintiff, focusing on the plaintiff's hearing loss, back and ankle pain. (Tr. 426-27.) Dr. Kothandaram opined that the plaintiff was limited to lifting, pushing or pulling five to ten pounds one to ten times in an hour, for less than one hour; standing or walking for less than one hour; and that he could not kneel, squat or handle "repetitive bending, crouching, [and] stooping." (Tr. 370-71.) He added that the plaintiff should "[u]se [an] elevator when available." (Tr. 371.) Dr. Kothandaram also determined that the plaintiff was anxious, and "limited" in "tolerating stress," "adapting to change[, and] regulating emotions." (Tr. 372.)

On January 26, 2018 Dr. Joshua Lipsman, a FEGS family practice specialist, reviewed records of Dr. Kothandaram's examination, and determined that the plaintiff was temporarily unable to work because of "mental health conditions that continue to be unstable." (Tr. 443.) On March 26, 2018 Dr. Lipsman, apparently relying on the same 2017 examination records, updated his determination, stating that the plaintiff would be employable if he got "voc[ational] rehab[ilitation] services." (Tr. 431.)

On May 18, 2018 Dr. Michael Kushner, a consultative psychological examiner, concluded that the plaintiff had impaired memory and concentration, below average intellectual functioning, and "slow or stiff motor behavior." (T. 482-83.) The plaintiff could not complete a simple arithmetic problem, and his "general fund of information [was] somewhat limited." (Tr. 483-84.) Dr. Kushner diagnosed the plaintiff with an unspecified depressive disorder and an

unspecified learning disorder (Tr. 484), with mild to moderate cognitive limitations with two exceptions: "at least moderate limitation" in understanding, remembering or applying complex directions and instruction, and no limitations in "maintaining his appearance," "making work related decisions," sustaining regular attendance at work, or "being aware of normal hazards." (Tr. 483.)  Dr. Kushner attributed the plaintiff's limitations to "psychiatric and cognitive problems," but opined that the "psychiatric problems . . . [do] not appear to be significant enough to interfere with the claimant's ability to function on a daily basis."  (*Id*.)

On May 23, 2018, Dr. Aurelio Salon completed an internal medicine examination of the plaintiff.  (Tr. 486-89.)  The plaintiff said that he had been experiencing severe low back pain and daily ankle pain for four or five years but had never consulted a doctor or had physical therapy.  (Tr. 486.)  The plaintiff had an "antalgic" gait and "declined to walk on heels and toes or to do squatting."  (Tr. 487.)  He used his late mother's cane but it was "not currently medically necessary."  (*Id*.)  Dr. Salon examined an x-ray of the plaintiff's right ankle and determined that he had "no acute condition."  (Tr. 488.)  An x-ray of his lumbosacral spine, however, showed a degenerative condition.  (*Id*.)  Nevertheless, Dr. Salon reported that "there are no objective findings to support the fact that the claimant would be restricted in his ability to sit or stand, or in his capacity to climb, push, pull or carry heavy objects."  (Tr. 489.)

On May 27, 2018, Dr. Joseph Gottesman, a radiologist, explained that an x-ray of the plaintiff's lumbosacral spine showed narrowing of the spinal discs, degeneration in the cartilage and bones of his neck spine and straightening consistent with muscle spasm.  (Tr. 491.)

On October 17, 2019, Gretel Canada, a qualified healthcare professional at WeCare assessed the plaintiff, and reported that he could not read or write, fill out forms, or recall his brother's emergency contact information.  (Tr. 498, 501.)  The plaintiff was alert, oriented, and

4

walking, cooperative and appropriately dressed, but emotional, easily excited and "happy and sad within [a] short span of time." (Tr. 500-01.) The plaintiff reported that his diabetes, hypertension, right ankle pain, back pain, hearing loss, insomnia, depression anxiety, and panic disorder affected his ability to work. (Tr. 500.) He could not "tolerate crowd[s]" or "closed spaces," was "easily agitated when pushed into doing something," and could not travel or tolerate a noisy environment because of his anxiety. (Tr. 500-01.) Ms. Canada concluded that the plaintiff had exertional limitations in lifting, standing, pushing and pulling because of his lower back and ankle pain. (Tr. 501.) He also had "sensory non-exertional limitations" because of his poor vision and hearing as well as postural non-exertional limitations, and psychiatric non-exertional limitations in understanding, memory, interpersonal, adaptation, and social interaction. (*Id*.) Because of these limitations, Ms. Canada determined that the plaintiff could not work. (Tr. 504.)

  c. **Administrative Hearing**

At his May 2020 hearing, the plaintiff testified that he stopped working as a custodian in 2017 to take care of his mother, who died a few months later. (Tr. 34.) The plaintiff became depressed. (Tr. 39.) He could not fill out job applications because he could not read, write, or use a computer. (Tr. 38.) He could not work at all because of his back and ankle pain. (Tr. 44.)

A vocational expert ("VE"), testified that the plaintiff's past work as a custodian required "medium exertion." (Tr. 47.) The ALJ asked the VE whether a hypothetical individual who "has no exertional limitations, but is limited to simple work that does not require reading or writing with only occasional changes in the work setting, no work at a fast-production rate pace, and occasional interaction with others" including the public, supervisors, and coworkers, could perform the plaintiff's past relevant work as a janitor; the VE replied that the hypothetical person could. (Tr. 48-49.) The ALJ posed no other hypotheticals. (*Id*.)

### d. The ALJ's Decision

On June 1, 2020, the ALJ denied the plaintiff's application for disability benefits. (Tr. 18.) She found that his mental diagnoses—depressive disorder with panic disorder and a learning disability—were severe impairments, and that his physical impairments—diabetes, and back and ankle pain—were non-severe. (Tr. 12-13.) She determined that the plaintiff's diabetes was well-controlled with medication (Tr. 12), and that his complaints of ankle and back pain were not substantiated by the medical record (Tr. 13), because of the "very limited treatment record regarding his back and ankle pain." She also cited the "normal results" of a May 2018 physical exam as evidence that those physical impairments were non-severe. (*Id.*)

In making this assessment, she found that Dr. Kothandaram's opinion that the plaintiff was limited in lifting, standing, walking, pushing, pulling, kneeling, squatting, bending, crouching, and stooping was unpersuasive, because it was inconsistent with the plaintiff's "normal physical examinations." (*Id.*) In contrast, she found Dr. Salon's opinion that the plaintiff had no exertional limitations to be consistent with his physical examination. (*Id.*)

The ALJ determined that the plaintiff's mental impairments did not make him disabled under the "paragraph B" criteria, because he had only mild to moderate limitations in the four categories of functioning laid out in the CFR. (*Id.*) Specifically, she found that the plaintiff had (i) moderate limitation understanding, remembering or applying information; (ii) moderate limitation interacting with others; (iii) mild limitation concentrating, persisting or maintaining pace, and (iv) moderate limitation adapting or managing himself. (Tr. 14.) In determining that the plaintiff did not satisfy "paragraph C" criteria, she found that he "demonstrated the minimal capacity to adapt to changes in his environment or demands that are not part of his daily life." (*Id.*)

The ALJ then determined that the plaintiff had a residual function capacity ("RFC") to "perform a full range of work at all exertional levels but with the following non-exertional limitations: [] simple work with only occasional changes in the work setting and no work at a fast production rate; and only occasional interaction with others, such as supervisors, co-workers, and the general public." (Tr. 14-15.) She determined that while the plaintiff's mental impairments "could reasonably be expected to cause the alleged symptoms," his statements "concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." (Tr. 16.) She found that the opinions of Dr. Kushner and Dr. Kothandaram were unpersuasive, while Ms. Canada's opinion was "generally persuasive." (Tr. 17.) The plaintiff's ability to "perform daily activities" supported a finding only of mild limitations, but the ALJ credited the plaintiff's testimony that he could not get along with other people and did not socialize. (*Id.*) Finally, the ALJ determined that the plaintiff could perform his past relevant work as a janitor, accepting the findings of the VE. (Tr. 18.)

## STANDARD OF REVIEW

A court reviewing a final decision of the Commissioner must first determine whether the correct legal standards were applied, and if so, whether substantial evidence supports the decision. *Atwater v. Astrue*, 512 F. App'x 67, 69 (2d Cir. 2013). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008). "[I]f supported by substantial evidence," the Commissioner's factual findings "shall be conclusive." 42 U.S.C. § 405(g).

Although the Commissioner's factual determinations are binding when they are supported by substantial evidence, a court will not defer to the Commissioner's decision "[w]here an error of law has been made that might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 188-89 (2d Cir. 2004) (alteration in original) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)). Thus, "legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009).

"Remand is warranted where 'there are gaps in the administrative record or the ALJ has applied an improper legal standard.'" *Antonetti v. Comm'r of Soc. Sec. Admin.*, No. 19-CV-1396, 2020 WL 3893010, at *4 (E.D.N.Y. July 11, 2020) (quoting *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999)). "Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision." *Id.* (citing *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

## DISCUSSION

### I. Legal Standard

An ALJ employs a five-step sequential process to evaluate whether a claimant meets the definition of disabled under the Act:

> [I]f the Commissioner determines (1) that the claimant is not working, (2) that he has a 'severe impairment,' (3) that the impairment is not one [listed in Appendix 1 of the regulations] that conclusively requires a determination of disability, and (4) that the claimant is not capable of continuing in his prior type of work, the Commissioner must find him disabled if (5) there is not another type of work the claimant can do.

*Burgess*, 537 F.3d at 120 (internal quotation marks and citation omitted); 20 C.F.R. § 404.1520(a)(4).

If the claimant's impairments do not satisfy the criteria at Step 3, "the Commissioner considers all of the relevant medical and other evidence and decides the claimant's residual

8

functional capacity ('RFC').  A claimant's RFC represents "the most [he or she] can still do despite [his or her] limitations."  *Haiss v. Berryhill*, No. 17-CV-8083, 2019 WL 3738624, at *2 (S.D.N.Y. May 15, 2019) (citations omitted), *report and recommendation adopted sub nom. Haiss v. Comm'r of Soc. Sec.*, No. 17-CV-8083, 2019 WL 5690712 (S.D.N.Y. Nov. 4, 2019). The ALJ must assess a plaintiff's RFC "based on all the relevant evidence in the case record." *Colegrove v. Comm'r of Soc. Sec.*, 399 F. Supp. 2d 185, 192 (W.D.N.Y. 2005) (citing 20 C.F.R. § 416.945(a)(1)).  The assessment must "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Martinez v. Colvin*, 286 F. Supp. 3d 539, 544 (W.D.N.Y. 2017) (internal quotation marks and citation omitted).

According to 20 C.F.R. § 404.1520c, the ALJ is no longer required to follow the "treating physician rule" when assessing a claim filed on or after March 27, 2017.  Instead, the ALJ should consider five factors to determine whether a medical opinion is persuasive: (1) supportability; (2) consistency; (3) the source's relationship with the patient; (4) the source's specialty; and (5) "other factors that tend to support or contradict" the opinion.  20 C.F.R. §§ 404.1527c(c)(1)-(5). After considering these factors, the ALJ must articulate "how persuasive she find[s] all of the medical opinions and all of the prior administrative medical findings in [the plaintiff's] case record."  § 404.1520c(b).

The most important factors are supportability and consistency; the ALJ is not required to explain her consideration of all five factors, but must discuss these two.  *Telleria v. Comm'r of Soc. Sec.*, No. 21-CV-433, 2022 WL 3647287, at *3 (E.D.N.Y. Aug. 24, 2022); § 404.1520c(b)(2).  Additionally, "though ALJs are no longer directed to afford controlling weight to treating source opinions," the new regulations "still recognize the foundational nature of the

9

observations of treating sources." *Acheampong v. Comm'r of Soc. Sec.*, 564 F. Supp. 3d 261, 267 (E.D.N.Y. 2021) (quoting *Shawn H. v. Comm'r of Soc. Sec.*, No. 19-CV-113, 2020 WL 3969879, at *6 (D. Vt. July 14, 2020)). "[M]ultiple district courts that have reviewed ALJ decisions under the new SSA regulations have remanded cases where the evidence supporting or consistent with a rejected medical opinion was ignored or mischaracterized." *Velasquez v. Kijakazi*, No. 19-CV-9303, 2021 WL 4392986, at *27 (S.D.N.Y. Sept. 24, 2021).

The claimant "bears the burden of proving his or her case" at steps one through four of this framework. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). At step five, the burden shifts to the Commissioner, who must show that given the claimant's RFC, age, education and work experience, the claimant is "able to engage in gainful employment within the national economy." *Sobolewski v. Apfel*, 985 F. Supp. 300, 310 (E.D.N.Y. 1997).

## II. The ALJ's Consideration of the Plaintiff's Physical Limitations

### a. The ALJ's Step 2 Finding

The ALJ did not apply the correct legal standard at step two of her analysis, when she evaluated the severity of the plaintiff's ankle and back pain. An ALJ may not "arbitrarily substitute [her] own judgment for competent medical opinion." *McBrayer v. Sec. of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983). Rather, Section 404.1520c requires her to assess "how well a medical source supported their opinion(s) with 'objective medical evidence' and 'supporting explanations.'" *Pearson v. Comm'r of Soc. Sec.*, No. 20-CV-3030, 2021 WL 3373132, at *5 (E.D.N.Y. Aug. 3, 2021) (citations omitted). This means that while she may refer to "objective medical evidence," she may not base her decision on her own review of "raw data." *Id*. at *4.

The ALJ found that Dr. Kothandaram's conclusions about the plaintiff's back and ankle pain, and the limitations they caused, were not supported by the raw data documented in the

plaintiff's physical examinations. (Tr. 13.) It is not entirely clear how the ALJ made this determination, although it is apparent that she reviewed at least one physical examination result from 2018, data to which Dr. Kothandaram would not have had access because it post-dates his examination of the plaintiff. (Tr. 13.) On remand, the ALJ must explain her analysis of the expert's opinion. *Balotti v. Comm'r of Soc. Sec.*, No. 20-CV-8944, 2022 WL 1963657, at *5 ("[a]n ALJ must not only consider supportability and consistency in evaluating medical source opinions but also must explain the analysis of those factors in the decision." (citing 20 C.F.R. §404.1520c(b)(2))); *Vellone v. Saul*, No. 20-CV-261, 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted sub nom.*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021) ("[I]n cases where the new regulations apply, an ALJ must explain his/her approach with respect to the first two factors when considering a medical opinion[.]").

Nor did the ALJ explain why she found that Dr. Salon's opinion was consistent with the "results found during treatment." (Tr. 13.) The regulations provide that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." § 404.1520c(c)(2). The ALJ did not mention Ms. Canada's opinion that the plaintiff had exertional limitations (Tr. 501), which is consistent with Dr. Kothandaram's opinion, even though the ALJ also found that Ms. Canada's opinion was "generally persuasive" on the subject of the plaintiff's cognitive limitations. (Tr. 17.) "The ALJ cannot selectively choose only the part of the evidence that supports his conclusions." *Thompson v. Apfel*, No. 97-CV-7697, 1998 WL 720676, at *6 (S.D.N.Y. Oct. 9, 1998). On remand, the ALJ must explain with specificity why she found certain opinions in the record supported and consistent, and others unsupported and inconsistent.

The ALJ also found it significant that the plaintiff had not sought treatment for his back and ankle pain (Tr. 13), but the absence of treatment, without any accompanying medical opinion, is not a reason to discount a treating physician's opinion. *See Santiago v. Comm'r of Soc. Sec.*, No. 19-CV-4001, 2020 WL 6530884, at *6 (S.D.N.Y. May 5, 2020) ("[T]he ALJ is not a medical expert who is competent to: (a) opine on what, if any, back pain treatment or therapy is warranted under the circumstances; or (b) interpret medical evidence or the lack thereof under the circumstances."); *Shaw v. Chater*, 221 F.3d 126, 133 (2d Cir. 2000) (It was not unreasonable for claimant to discontinue treatment for back and ankle pain, when treatment provided no relief). This especially true in this case, given the plaintiff's learning disability and his psychological challenges, including anxiety and depression. *Cataneo v. Astrue*, No. 11-CV-2671, 2013 WL 1122626, at *20 (E.D.N.Y. Mar. 17, 2013) ("The inference [that a claimant's failure to seek treatment undermines his disability claim] is less plausible for an individual with a mental impairment with symptoms that include social anxiety and isolation.").

    **b.  The ALJ's RFC Determination**

Even assuming the plaintiff's physical limitations were not severe, the ALJ did not consider them when she determined the RFC. Section 404.1545 provides that "when [a claimant has] severe impairment(s), but [his] symptoms, signs, and laboratory findings do not meet or equal those of a listed impairment in appendix 1 of this subpart, [the ALJ must] consider the limiting effects of all impairment(s), even those that are not severe, in determining [the plaintiff's] residual functional capacity." *Pearson*, 2021 WL 3373132, at *5 ("[E]ven though the ALJ found that the plaintiff's stenosis, knee pain and mental impairments were 'non-severe,' she should have considered them in her RFC analysis."); *Zenzel v. Astrue*, 993 F. Supp. 2d 146, 154 (N.D.N.Y. 2012) ("In the present case, it is not clear that the ALJ considered the limiting effects of Plaintiff's headaches once she found them to be a non-severe impairment."). An ALJ making

12

an RFC determination must assess the claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the . . . assessment must include a discussion of the individual's abilities on that basis . . . . A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).

Thus, the ALJ was required to consider non-severe physical limitations in calculating the RFC. *See Shawn B. v. Comm'r of Soc. Sec.*, No. 20-CV-528, 2021 WL 3884226, at *5 (W.D.N.Y. Aug. 31, 2021) (The determination of per se disability at step three and the RFC determination at step four "require distinct analysis."). The ALJ does not appear to have considered any evidence of the plaintiff's physical limitations, or his age, in deciding that he had no exertional limitations. In finding that the plaintiff could "perform a full range of work at all exertional levels" (Tr. 14-15), the ALJ said only that the plaintiff "denied any treatment for his back pain," "did not want to take any pain medication" and "would be able to work if he did not experience back or ankle pain." (Tr. 15.) These statements are not inconsistent with the plaintiff's subjective complaints of pain.

Because the ALJ did not consider any non-severe physical limitations in calculating the RFC, she did not incorporate any of them in her single hypothetical to the vocational expert. (Tr. 48-49.) Accordingly, the vocational expert cited jobs with a "medium exertional demand," such as his prior work as a custodian—which involved maintaining New York City parks—a "kitchen helper" and a "packer." (*Id*.) On remand, the ALJ should consider both severe and non-severe limitations in assessing the RFC, and if appropriate, should pose a hypothetical that includes both severe and non-severe limitations.

13

## III. The ALJ's Consideration of the Plaintiff's Mental Limitations

### a. The ALJ's Step 3 Finding

On remand, at step three of her analysis, the ALJ should also reconsider whether the plaintiff's severe mental impairments render him disabled. At step three, an ALJ assesses allegations of mental impairment in "four broad functional areas": (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *Zacharopoulos v. Saul*, 516 F. Supp. 3d 211, 231 (E.D.N.Y. 2021); 20 C.F.R. § 404, Subpt. P, App. 1. "These four functional areas are known as the 'paragraph B' criteria." *Zacharopoulos*, 516 F. Supp. 3d at 231. To assess the four broad mental functional areas, the ALJ must apply the degree of limitations using a five-point scale consisting of "none, mild, moderate, marked, and extreme." *McMillian v. Comm'r of Soc. Sec.*, No. 20-CV-7626, 2022 WL 457400, at *5 (S.D.N.Y. Feb. 15, 2022); 20 C.F.R. § 416.920a(c)(4). To be rendered disabled under the "paragraph B criteria" the claimant must have one extreme limitation or two marked limitations in a broad area of functioning. 20 C.F.R. § 416.920a(c)(4).

The ALJ determined that of the four areas of mental impairment, the plaintiff was mildly limited in one and moderately limited in the others. (Tr. 13.) In making this determination, the ALJ considered objective medical evidence, but not expert opinions, except that she rejected Dr. Kushner's assessment that the plaintiff had an "impaired memory with below average intellectual functioning"[1] as unpersuasive because "his treatment showed overall normal mental status examinations." (Tr. 14.) The record showed, however, that the plaintiff could not read, write or fill out forms, and hesitated to seek psychological treatment because he could not fill out the

---

[1] Dr. Kushner noted the plaintiff had "at least moderate limitation" in understanding, remembering, or applying information.

14

forms.  On one occasion, he could not remember his brother's street address, and his brother was his emergency contact.  (Tr. 315, 462, 498, 501-02, 504.)[2]

Dr. Elshafei wrote in his treatment notes that he "counsel[ed] the patient about dealing with his stress and strategies to minimize stress, to control anxiety feeling, and for anger management."  (Tr. 575.)  Dr. Elshafei opined that the plaintiff had poor or no ability to relate to co-workers, deal with work stresses, or function independently, and thus could not adjust to a job.  (Tr. 585.)  Ms. Canada also determined that the plaintiff could not work because of his anxiety and depression, and could not interact with others, even though he was alert, oriented and walking and was "dressed appropriately for the weather and has fair hygiene."  (Tr. 500.)

On remand, the ALJ should re-evaluate the record of the plaintiff's limitations in understanding, remembering, or applying information and interacting with others.  The ALJ should consider the various medical opinions in the record, in light of 20 C.F.R. § 404.1520c, including supportability, consistency, and treating relationship.  *See Damiano v. Astrue*, No. 08-CV-1247, 2010 WL 2652209, at *4 (N.D.N.Y. June 7, 2010), *report and recommendation adopted*, 2010 WL 2652205 (N.D.N.Y. June 25, 2010) (remanding because it was "unclear on what evidence the ALJ relied in making the step three determination").

---

[2] As discussed in Section II.a, the ALJ considered Ms. Canada's opinion "generally persuasive," but found the plaintiff's limitation to be mitigated by his ability to "perform most activities of daily living." (Tr. 17.)  But a claimant's ability to handle some aspects of daily life is not, absent a medical opinion, substantive evidence that he is not disabled.  *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998).

15

## CONCLUSION

The plaintiff's motion for judgment on the pleadings is granted and the Commissioner's cross-motion is denied. The case is remanded for further proceedings consistent with this opinion.

**SO ORDERED.**

                     s/Ann M. Donnelly
                     _____
                     ANN M. DONNELLY
                     United States District Judge

Dated: Brooklyn, New York
      September 30, 2022